IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **GE CAPITAL COMMERCIAL INC.,** | § | |
| **et al.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. **3:09-CV-572-L** |
| | § | |
| **WORTHINGTON NATIONAL BANK,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are: (1) Defendant Worthington National Bank's 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction, filed March 7, 2011; (2) Defendant Worthington National Bank's 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction, filed April 27, 2011; (3) and Plaintiff's Motion for Leave to File Surreply to Defendant's Reply in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed March 28, 2011. After carefully considering the motions, responses, reply, and applicable law, the court **denies as moot** Defendant Worthington National Bank's 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction, filed March 7, 2011; **denies** Defendant Worthington National Bank's 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction, filed April 27, 2011; and **denies as moot** Plaintiff's Motion for Leave to File Surreply.

## I. Factual and Procedural Background

Plaintiffs GE Capital Commercial Inc., General Electric Capital Corporation, and GE Capital Financial Inc. (collectively, "GECC" or "Plaintiffs") filed their Original Complaint and Application for Preliminary and Permanent Injunction in this court on March 27, 2009. Plaintiffs filed their

Amended Complaint on April 9, 2009, alleging multiple claims against Defendants and requesting damages, attorney's fees, costs, a permanent injunction, and a writ of attachment. Plaintiffs originally instituted this suit against Wright & Wright, Inc. ("Wright & Wright"), BBAF Enterprises, Inc. ("BBAF"), Justin Prather ("Prather"), David Ashley Wright ("Wright"), Worthington National Bank ("Worthington"), PlainsCapital Bank ("PlainsCapital"), Sterling Bank ("Sterling"), Texana Bank ("Texana"), and Frank Boyd Buchanan, III ("Buchanan"). Worthington is the sole remaining Defendant in the suit, as all others have been dismissed.

Plaintiffs filed their Second Amended Complaint ("Complaint"), the live pleading, on June 26, 2009. The Complaint asserted claims for money had and received, violations of the Texas Uniform Fraudulent Transfer Act ("TUFTA"), breach of fiduciary duty, conversion, fraud, conspiracy, and the imposition of a constructive trust. Plaintiffs also seek damages, reasonable attorney's fees, costs, a permanent injunction, and a writ of attachment. By court order on December 31, 2009, the court dismissed Plaintiffs' conversion claim with prejudice, dismissed with prejudice the fraudulent transfer claims against Worthington and PlainsCapital to the extent that the claims concern the funds deposited and then held in Worthington and PlainsCapital bank accounts controlled by Defendants Prather, Buchanan, or Wright. GECC's conspiracy and breach of fiduciary duty claims against Prather, Buchanan, and BBAF, were dismissed after the parties settled. The breach of fiduciary claims against Wright and Wright & Wright, were dismissed after the parties settled. On February 23, 2011, the court granted Plaintiffs' Unopposed Motion to Dismiss Plaintiffs' Causes of Action for money had and received, permanent injunction, and constructive trust. The only substantive claims remaining are GECC's claims for fraudulent transfers in violation of TUFTA, attorney's fees, and court costs.

This action arises out of a series of allegedly fraudulent schemes resulting in the alleged conversion of over $12,500,000 from GECC.  Plaintiffs contend that, in 2004, Defendant Prather entered into a scheme with Defendants Wright and Buchanan involving the purchase and sale of heavy construction equipment. Both Wright and Buchanan allegedly, after being promised an improbable and high rate of return by Prather, orally agreed to invest millions of dollars into the scheme, turned over control of their bank accounts to Prather, created new accounts and business entities with Prather, and sought outside investors to finance the heavy equipment purchases.

Wright allegedly maintained bank accounts with Defendant Sterling Bank in his own name and in the name of Wright & Wright, a company of which Wright was the sole member and owner by 2003.  Buchanan allegedly maintained a bank account with Defendant PlainsCapital Bank in the name of Defendant BBAF, a company incorporated by Buchanan in 2006.   In 2007, Prather and Wright allegedly opened a bank account together at Defendant Worthington Bank and, in connection therewith, sought and obtained a $2,500,000 line of credit from Worthington.

GECC contends that the Worthington line of credit, ostensibly acquired for the purpose of purchasing heavy equipment, was never used for that purpose.  By June 2008, Prather and Wright still owed Worthington $2,470,000 to satisfy the bank's demand for repayment of the loan and had nothing to show from their alleged heavy equipment scheme.  During the same time period, Prather also allegedly acquired a $3,500,000 loan from PlainsCapital.  The terms of the PlainsCapital loan required Prather to maintain certain accounts at PlainsCapital with a minimum average monthly balance reaching into the range of hundreds of thousands of dollars; Prather allegedly could not independently meet these obligations.

As a result of Worthington's loan repayment demand, and, due to the necessity to maintain high value accounts with PlainsCapital, Prather allegedly engineered a new scheme to steal money to pay off his debt. In late June or early July 2008, Prather's employer, CitiCapital Commercial Corporation, operated a credit extension program that financed the purchase of golf cars, and Prather was the manager of this program. Prather allegedly used his status as manager to beguile Citi into wiring money directly into the bank accounts of BBAF and Wright & Wright by falsely indicating that those two companies were golf car "distributors." During July 2008, Prather allegedly wired almost $7,500,000 to Wright & Wright's bank account, and used $2,470,000 of that money to repay Worthington. In early August 2008, GECC underwent a merger and acquired CitiCapital Commercial Corporation, while Prather continued perpetuating his scheme. Prather allegedly created fabricated invoices, false e-mails, fraudulent promissory notes, and fictitious GECC employees to protect his scheme, causing GECC to wire over $5,000,000 more to BBAF and Wright & Wright between August 2008 and January 2009.

Once the combined $12,500,000 allegedly stolen through Prather's scheme was deposited into BBAF's or Wright & Wright's bank accounts by CitiCapital Commercial Corporation and GECC, Prather, Buchanan, or Wright would allegedly wire those funds to other bank accounts. These bank accounts included Buchanan's personal account at PlainsCapital, Wright's personal account at Sterling, and Prather's personal accounts. Worthington allegedly grew suspicious of Prather and Wright's financial dealings with their "investors," but it declined to investigate the suspicious transactions, instead electing to close Prather and Wright's bank accounts. PlainsCapital and Sterling also allegedly had these same suspicions but made no investigation and did not close the accounts.

Prather allegedly used many of the fraudulently acquired funds to maintain the minimum required account balances at PlainsCapital to maintain his $3,500,000 loan.  In March 2009, however, Prather ultimately defaulted on this loan, and PlainsCapital then allegedly seized over $525,000 from Prather's other bank accounts.  As previously stated by the court, the only remaining claims are those for fraudulent transfer in violation of TUFTA, as Plaintiffs contend that Worthington is still in possession of funds that were fraudulently acquired by Prather, and a claim for attorney's fees.

On March 7, 2011, Worthington filed a motion to dismiss for lack of subject matter Jurisdiction.  Worthington contends that Plaintiffs do not have standing to assert their claims because Plaintiffs did not suffer an injury.  On March 30, 2011, the court held a pretrial conference and conferred with the parties regarding Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction.  Through the course of discussing standing, Plaintiffs requested that they be allowed two weeks to produce additional documents related to the issue of standing.  Given the importance of the standing issue, the court granted Plaintiffs' request and instructed Plaintiffs to produce documents establishing their standing to assert claims against Worthington.  Defendant was then instructed to file an amended or a new motion to dismiss pursuant to 12(b)(1) of the Federal Rules of Civil Procedure by April 27, 2011.  Plaintiffs were directed to respond by May 11, 2011, and Defendant was instructed to file a reply by May 21, 2011.  All parties complied with the amended scheduling order.

## II.     Legal Standard- Rule 12(b)(1) Dismissal for Lack of Standing

Worthington questions whether Plaintiffs have standing to bring this action.  Article III of the Constitution "confines the federal courts to adjudicating actual 'cases' and 'controversies.'"

*Allen v. Wright,* 468 U.S. 737, 750 (1984).   To establish standing, a plaintiff must satisfy three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations, quotation marks, and footnote omitted).   Because the question of standing implicates the court's subject matter jurisdiction, that is, the court's statutory or constitutional power to adjudicate a claim or dispute, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), the court applies the standards for a motion to dismiss pursuant to Rule 12(b)(1).

A federal court has subject matter jurisdiction over cases "arising under" the Constitution, laws, or treaties of the United States, or in cases where the matter in controversy exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.  28 U.S.C. §§ 1331, 1332.   Federal courts are courts of limited jurisdiction and must have statutory or constitutional power to adjudicate a claim.  *See Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).  Absent jurisdiction conferred by statute or the Constitution, they lack the power to adjudicate claims and must dismiss an action if subject matter jurisdiction is lacking.  *Id.; Stockman v. Federal Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998) (citing *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)).  A federal court has an independent duty, at any level of the proceedings, to determine whether it properly has subject

matter jurisdiction over a case. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."); *McDonal v. Abbott Labs.*, 408 F.3d 177, 182 n.5 (5th Cir. 2005) ("federal court may raise subject matter jurisdiction *sua sponte*").

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate: (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir.), *cert. denied*, 534 U.S. 1127 (2002); *see also Ynclan v. Dep't of Air Force*, 943 F.2d 1388, 1390 (5th Cir. 1991). Thus, unlike a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court is entitled to consider disputed facts as well as undisputed facts in the record. *See Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986). All factual allegations of the complaint, however, must be accepted as true. *Den Norske Stats Oljeselskap As*, 241 F.3d at 424.

## III. <u>Analysis</u>

Defendant asserts that Plaintiffs lack standing to assert claims against it because Plaintiffs did not suffer an injury-in-fact. Specifically, Defendant contends that Plaintiffs are not the successors-in-interest to CitiCapital Commercial Corporation's fraudulent transfer claims, and as a result, are not the proper parties to bring suit. Defendant asserts four separate bases for dismissal. Worthington argues that dismissal is appropriate because: (1) Plaintiffs failed to assert good cause to amend the Scheduling Order; (2) Michael Meehan's ("Meehan") affidavit is inadmissible as a matter of law; (3) Plaintiffs' basis for standing in their surreply fails; and (4) Plaintiffs fail to distinguish which, if any, of the three Plaintiffs have standing. Plaintiffs respond that they each have

standing to assert their claims because they are the successors-in-interest to CitiCapital Commercial

Corporation's claim for fraudulent transfer.  The court will consider each issue separately.

### A.      April 13, 2011 Production of Documents

Defendant contends that Plaintiffs improperly sought oral leave at the pretrial conference to

amend the Amended Scheduling Order, reopen discovery, set new deadlines, and vacate the trial

setting.  Specifically, Defendant states that Plaintiffs provided two unsupportable reasons for

amending the Amended Scheduling Order.   Defendant contends that Plaintiffs supported their

request by arguing that (1) "It is important to get this right," and (2) Plaintiffs "have litigated this

case for two years, [and] spent hundreds of thousands of dollars in attorney's fees."  Def.'s App. at

204-05.

Plaintiffs respond that the court properly granted them leave to produce documents.

Plaintiffs contend that they were properly granted leave to address Defendant's "best evidence"

objection to documents previously produced.  In the alternative, Plaintiffs contend that instead of

objecting based on the best evidence rule, Defendant should have filed a motion to compel

documents supporting standing.

Defendant replies that Plaintiffs' response fails to allege good cause, and, therefore, the April

13, 2011 documents should not be considered.  Defendant also contends that Plaintiffs contentions

are nonsensical because it is Plaintiffs' burden to prove standing, and it is Plaintiffs' obligation to

produce documents to prove their case.  Defendant further contends that Plaintiffs failed to disclose

their "new" theories or the existence of additional documents to support standing.

Before the court can modify a scheduling order, the movant must first show "good cause"

for failure to meet the scheduling order deadline under Rule 16(b).  *S & W Enters., L.L.C. v.*

*Southwest Bank of Alabama*, 315 F.3d 533, 536 (5th Cir. 2003). A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b). The good cause standard requires the "party seeking relief to show that the deadlines [could not] reasonably be met despite the diligence of the party needing the extension." *S & W Enters.*, 315 F.3d at 535 (citation omitted). In deciding whether to allow an amendment to the scheduling order, a court considers: (1) the explanation for the party's failure to meet the deadline; (2) the importance of the amendment to the scheduling order; (3) potential prejudice if the court allows the amendment; and (4) the availability of a continuance to remedy such prejudice. *Id.* (internal quotation marks, brackets, and citations omitted).

After reviewing the parties' arguments, the record, and applicable law, the court reaffirms its decision to allow Plaintiffs' to produce the April 13, 2011 documents. In so far as diligence is concerned, Defendant's initial motion to dismiss is what put this case in its current posture. Motions to dismiss for lack of jurisdiction are customarily filed during the early stages of litigation, not on the *eve of trial*. The reason is that unnecessary costs and time should not be expended if the court lacks subject matter or personal jurisdiction. If Defendant believed Plaintiffs did not have standing, Defendant should have raised the issue well before the eve of trial. The issue of diligence begs the question because it presupposes that Plaintiffs knew or expected Defendant to file a motion to dismiss for lack of standing. The record does not reflect that this is the case. The request by Plaintiffs for additional time to produce additional documents was made *after* the initial motion was filed. The court finds Defendant's argument regarding diligence specious and disingenuous.

Further, Plaintiffs' explanation for their failure to meet the discovery deadline was sufficient. In response to Defendant's request for the production of documents, Plaintiffs produced the

Purchase and Sale Agreement ("PSA"). The PSA governed the CitiCapital Commercial Transaction. Plaintiffs produced these documents prior to Defendant filing its motion to dismiss. In Defendant's March 28, 2011 Reply, Defendant asserted that the PSA and the accompanying affidavit from Meehan, were not the "best evidence" to support Plaintiff's standing claim. As a result, Plaintiffs requested additional time to satisfy Defendant's objection. Defendant now objects that Plaintiffs should not be allowed to produce additional documents to satisfy its "best evidence" objection. As stated at the hearing, Defendant cannot have it both ways. Defendant cannot challenge Plaintiffs to prove their standing on the one hand, and then, on the other hand, put up procedural roadblocks to prevent them from producing documents to support their standing argument. To allow such tactical schemes would be patently unfair.

Additionally, given the stage of the litigation, it is important to allow Plaintiffs to amend the scheduling order. Amendment of the scheduling order is imperative to decide accurately the issue of standing before the court. This lawsuit is almost three-years old, and both sides have spent considerable sums litigating the issues before the court. The court, in this instance, should have a complete record to decide the issue of standing. It would be injudicious to allow otherwise at this juncture.

Furthermore, other than making a conclusory statement that it has been prejudiced, Defendant provides no information to show that it has truly suffered any legal prejudice. Even if the extension of time to produce the documents prejudiced Defendant, the court gave Defendant an opportunity to cure any prejudice. The court continued the trial date and motion deadlines. Defendant was given two weeks to review and address the documents, which it did. Moreover, Defendant has made no request for additional discovery as a result of its review, although the court

left the door open for Defendant to do so at the hearing. The only reasonable inference is that additional discovery by Defendant would not assist it regarding the issue of standing. Consequently, the court determines that good cause existed to allow amendment of the scheduling order.

Further, Plaintiffs properly received leave of the court to amend the scheduling order. Not only did the court give Plaintiffs oral leave to produce the documents, but the court gave Plaintiffs written permission in its March 30, 2011 order. Accordingly, the court reaffirms its decision to allow Plaintiffs to produce the April 13, 2011 documents and will consider the April 13, 2011 documents in evaluating the pending motion.

### B. Affidavit of Michael Meehan

Defendant contends that the court should strike and refuse to consider Meehan's affidavit, the Acting Chief Compliance Officer for GE Capital, which was attached to Plaintiffs' response. Defendant contends that Meehan's affidavit is inadmissible because Plaintiffs did not identify Meehan as an individual likely to have discoverable information as required by Rule 26(a) of the Federal Rules of Civil Procedure. Defendant contends that the court should exclude his affidavit in accordance with Rule 37(c)(1) because Meehan had personal knowledge of information to potentially bolster Plaintiffs' standing argument and failed to disclose his identity.

After reviewing Defendant's contentions and the applicable law, the court determines that Meehan's affidavit is admissible, and the court will consider it. Here, Defendant essentially brought Meehan's personal knowledge into issue when it filed the **eleventh-hour** motion to dismiss. Plaintiffs responded by using Meehan's personal knowledge for the sole purpose of defending themselves against Defendant's motion. But for Defendant's Motion to Dismiss, Plaintiffs would not have sought admission of Meehan's affidavit.

In any event, Defendant should have filed a motion to compel Meehan's deposition, or, in the alternative, Defendant should have requested additional time to depose Meehan at the pretrial conference. Moreover, at the pretrial conference, the court stated that if Defendant needed additional discovery, it would allow Defendant to do so if requested. Defendant did neither, which leads the court to question Defendant's motives on this issue and whether Defendant is using dilatory tactics to delay trial; nevertheless, the court is unimpressed. Accordingly, the court determines that Meehan's affidavit is proper, and it court will consider the affidavit in ruling on the instant motion.

### C.    Plaintiffs' Surreply

Defendant contends that the court should not consider Plaintiffs' surreply because the surreply fails to support Plaintiffs' basis for standing as a matter of law. The court will not consider this argument. The surreply is moot because the arguments raised by surreply have been reasserted in Plaintiffs' response to Defendant's April 27, 2011 Motion to Dismiss; therefore, the motion is moot. Further, there is no need to analyze the surreply because the court decides that Plaintiffs do have standing to pursue their lawsuit. Accordingly, the court will deny as moot Plaintiffs' Motion for Leave to File Surreply to Defendant's Reply in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction as moot.

### D.    Rule 12(b)(1) Motion to Dismiss

Defendant asserts various contentions to support its argument that Plaintiffs lack standing to assert their claims. First, Defendant contends that Plaintiffs cannot establish standing by showing that GE Capital Financial Inc. merely acquired the stock of CitiCapital Commercial Corporation. Specifically, Defendant contends that the purchase of stock does not equate to the purchase of assets

and thus Plaintiffs cannot assert standing on that basis. Second, Defendant contends that GE Capital Financial Inc. did not acquire all of the assets and liabilities of CitiCapital Commercial Corporation or the right to assert claims thereunder. Third, Defendant argues that the PSA, as produced by Plaintiffs, is riddled with redactions, and that it is impossible to determine exactly what was excluded from the sale. Last, Defendant contends that Plaintiffs cannot determine which, if any, of the three Plaintiffs has standing.

Plaintiffs respond that each of them has standing to assert claims against Worthington. Plaintiffs contend that the Purchased Assets of the Purchased Subsidiaries were not specifically excluded. Plaintiffs further respond that the court should reject Defendant's argument that the stolen funds do not relate to the underlying contract. Last, Plaintiffs contend that the court should reject Defendant's argument that the PSA as produced by Plaintiffs is riddled with redactions.

Defendant replies that Plaintiffs failed to prove that the defalcation referenced in the indemnity agreements is attributable to the damages arising out of Prather's scheme. Further, Defendant replies that Plaintiffs newest interpretation of the PSA does not confer standing to each party.

### 1. Relevant Documents and Transactions

### a. Purchase and Sale Agreement

On April 17, 2008, GE Capital Financial Inc., Citibank N.A., and other entities entered into a PSA. The PSA set forth the terms in which GE Capital Financial Inc. purchased CitiCapital Commercial Corporation from Citibank. CitiCapital Commercial Corporation was formerly a wholly-owned subsidiary of CitiBank. Section 2.1 of the PSA provides in relevant part:

> Purchase and Sale of Assets. On the Closing Date, upon the terms and subject to the conditions of this Agreement . . . the U.S. Sellers

> shall . . . sell transfer, convey, and assign to the U.S. Purchaser . . . all
> right, title, and interest of such U.S. Seller Group member (but not
> any member of the Purchased Subsidiaries Group) in and to the
> Purchased Assets . . . , including all outstanding Equity Securities
> issued by the Purchased Subsidiaries.

Pl.'s App. at 46-47. Article I of the PSA defines the "US Seller Group" to mean Citibank and

various other sellers. Pl.'s App. at 46-47. Article I of the PSA also defines the "US Purchaser" to

mean GE Capital Financial Inc. *Id.* at 16. The PSA further defines CitiCapital Commercial

Corporation as one of the Purchased Subsidiaries. *Id.* at 38. The PSA defines the "Purchased

Assets" to mean "all outstanding Equity Securities issued by the Purchased Subsidiaries." *Id.* at 47.

The court interprets Section 2.1 of the PSA to mean that on July 31, 2008, Citibank sold, transferred,

conveyed, and assigned its right, title, and interest in the (1) enumerated Purchased Assets (which

includes the Purchased Subsidiaries stock) and (2) all outstanding Equity Securities issued by the

Purchased Subsidiaries (including CitiCapital Commercial Corporation).

### b.     The Assignment and Assumption Agreement and Stock Transfer

On July 31, 2008, the parties to the PSA executed the Assignment and Assumption

Agreement (AAA). Section 1 of the AAA provides in pertinent part:

> Assignment and Assumption. Pursuant to and in accordance with the
> terms and conditions of this Agreement and the Purchase Agreement
> . . . each of the Assignors [which includes Citibank], for good and
> valuable consideration, the receipt and sufficiency of which are
> hereby acknowledged, hereby sells, transfers, assigns, and conveys
> to the Assignees [which includes GE Capital Financial Inc.], all of
> such Assignor's right, title, and interest in and to the U.S. Purchased
> Assets [which includes all of the Equity Securities of CitiCapital
> Commercial Corporation.]

Pls.' App. at 254. The court interprets this provision to mean that Citibank sold, transferred,

assigned, and conveyed the U.S. Purchased Assets, which included all of the outstanding Equity

Securities of CitiCapital Commercial Corporation, to GE Capital Financial Inc. Citibank further memorialized the sale, assignment, and transfer by providing a stock certificate representing the total authorized issued stock of CitiCapital Commercial Corporation to GE Capital Financial Inc. *Id.* at 270-72.

### c. CitiCorp Leasing, Inc. Merger

Pursuant to the PSA and AAA, GE Capital Financial Inc. acquired several of Citibank's subsidiaries, including Citicorp Leasing, Inc., CitiCapital Commercial Corporation, CitiCorp Vendor Finance, Inc., Bankers Leasing Corporation, and CBL Capital Corporation. *Id.* at 38. On August 4, 2008, GE Capital Financial Inc. caused all of the Purchased Subsidiaries, including CitiCapital Commercial Corporation, to merge into CitiCorp Leasing, Inc. *Id.* at 277-88. As a result of the merger, GE Capital Financial Inc. owns CitiCorp Leasing, Inc.

### d. The Parental Support Agreement and the Indemnity and Contribution Agreement

General Electric Capital Corporation directly owns 100% of the outstanding equity interests of GE Consumer Finance Inc., GE Consumer Finance Inc. directly owns 100% of the outstanding equity interests of GE Capital Financial Inc., and GE Capital Financial Inc. owns 100% of the outstanding equity interests of GE Capital Commercial Inc. *Id.* at 318.

On July 28, 2008, GE Capital Financial Inc. and General Electric Capital Corporation executed a Parental Support Agreement. Pursuant to the Parental Support Agreement, General Electric Capital Corporation (the "Parent") agreed to protect and indemnify GE Capital Financial Inc. (the "Bank") and to pay any and all claims, damages, penalties, and expenses relating to or arising out of the CitiCapital Transaction. *Id.* at 315. On April 23, 2009, GE Capital Financial Inc., GE Capital Commercial Inc., GE Consumer Finance Inc., and General Electric Capital Corporation

entered into an Indemnity and Contribution Agreement, pursuant to Section 4.1 of the Parental Support Agreement. *Id.* at 318-22.

GE Capital Financial Inc. identified after-tax losses of $3,781,787 "relating to accruals required in accordance with Bank policy for expected losses and expenses related to a defalcation that has been identified with respect to the CitiCapital Transaction." *Id.* at 318. Plaintiffs contend that the "defalcation" mentioned in the Indemnity and Contribution Agreement includes the money stolen by Prather, as evidenced by the three wire transfers. *Id.* at 5. As a result of the defalcation, General Electric Capital Corporation, "'in satisfaction of its obligation under Section 4.1 of the [Parental] Support Agreement,' agreed to contribute cash to the capital of GE Capital Financial Inc." *Id.* at 318. In exchange, GE Capital Financial Inc. agreed to contribute cash to the capital of GE Capital Commercial Inc. *Id.*

## 2.    Standing

After carefully reviewing the parties' contentions, record, and applicable law, the court determines that General Electric Capital Corporation, GE Capital Financial Inc., and GE Capital Commercial Inc. have standing to assert claims against Worthington. The court addresses below each Plaintiff's basis for standing.

### a.    GE Capital Commercial Inc.

Under Texas law, "[t]he surviving or new corporation in a merger assumes the liabilities and obligations of the constituent corporations and may prosecute any of the constituent corporations' claims or actions." *North American Land Corp. v. Boutte,* 604 S.W.2d 245, 246 (Tex.Civ.App.—

Houston [14th Dist.] 1980, writ ref'd n.r.e.) *(citing Tex.Bus.Corp.Act, Art. 5.06).* [*] Worthington contends that GE Capital Commercial Inc. does not have standing by merely acquiring CitiCapital Commercial Corporation's stock. Plaintiffs contend that GE Capital Commercial Inc. has standing to assert claims against Worthington because it is the successor-in-interest to CitiCapital Commercial Corporation's claims against Worthington. The court agrees with Plaintiffs.

Pursuant to the PSA and the AAA, GE Capital Financial Inc. purchased all of the stock of CitiCapital Commercial Corporation, which included all of CitiCapital Commercial Corporation's assets and liabilities. Following the closing of the transaction, CitiCapital Commercial Corporation, merged into CitiCorp Leasing Inc., which later changed its name to GE Capital Commercial Inc., one of Plaintiffs in the instant lawsuit. The court determines by virtue of the PSA, the AAA, and the CitiCorp Leasing merger, GE Capital Commercial Inc. is the direct successor-in-interest to CitiCapital Corporation. Defendant does not dispute that CitiCapital Corporation has standing, that is, it has suffered an injury in fact of a legally protected interest that is concrete, particularized, and actual. As the new corporation, GE Capital Commercial Inc., assumes the liabilities, obligations, assets, and claims of CitiCapital Commercial Corporation. *See North American Land Corp.,* 604 at 246. Thus, GE Capital Commercial Inc. may prosecute CitiCapital Commercial Corporation's injuries at issue in this lawsuit. Accordingly, GE Capital Commercial Inc. has standing to sue Worthington and is a proper plaintiff in this lawsuit.

---

[*] Article 5.06 of the Texas Business Corporations Act expired on January 1, 2010. The provision is now incorporated into Section 10.008 of the Texas Business Organization Code. In any event, Article 5.06 was in effect until January 2010, and therefore, was in effect at the time the cause of action accrued.

### b. GE Capital Financial Inc. and General Electric Capital Corporation

Plaintiffs GE Capital Financial Inc. and General Electric Capital Corporation both have standing to sue Worthington by virtue of the Parental Support Agreement and the Indemnity and Contribution Agreement for losses arising from GE Capital Financial Inc.'s acquisition of the Purchased Subsidiaries.

On July 28, 2008, GE Capital Financial Inc. and General Electric Capital Corporation executed the Parental Support Agreement. Pursuant to the terms of the Agreement, General Electric Capital Corporation (the "Parent") agreed to protect and indemnify GE Capital Financial Inc. (the "Bank") and to pay any and all claims, damages, penalties, and expenses relating to or arising out of the CitiCapital Transaction. On April 23, 2009, GE Capital Financial Inc., GE Capital Commercial Inc., GE Consumer Finance Inc. and General Electric Capital Corporation entered into an Indemnity and Contribution Agreement. Pursuant to the terms of the Indemnity and Contribution Agreement, General Electric Capital Corporation, "in satisfaction of its obligation under Section 4.1 of the Support Agreement," agreed to contribute cash to the capital of GE Capital Financial Inc. Pls. App. at 318. In turn, GE Capital Financial Inc. agreed to contribute cash to the capital of GE Capital Commercial Inc. to compensate for identified losses relating to or arising out of the CitiCapital Transaction. Following the CitiCapital Transaction, GE Capital Financial identified after-tax losses of $3,781,787 "relating to accruals required in accordance with Bank policy for expected losses and expenses related to a defalcation that [was] identified with respect to the CitiCapital transaction." *Id.* The defalcation mentioned in the Indemnity and Contribution Agreement includes the money transferred by Prather in furtherance of the scheme.

Here, Plaintiffs GE Capital Financial Inc. and General Electric Capital Corporation both have standing to sue by virtue of the Parental Support Agreement and the Indemnity and Contribution Agreement. As a result of Prather's conduct, GE Capital Financial Inc. suffered an injury in fact of a legally protected interest that is concrete, particularized, and actual. Pursuant to the terms of the Parental Support Agreement and the Indemnity and Contribution Agreement, General Electric Capital Corporation agreed to contribute cash to GE Capital Financial Inc. to compensate for identified losses relating to or arising out of the CitiCapital Transaction. As a result of the agreements, General Electric Capital Corporation will also suffer an injury in fact of a legally protected interest that is concrete, particularized, and actual. Consequently, Plaintiffs GE Capital Financial Inc. and General Electric Capital Corporation have standing to assert claims arising out of TUFTA.

Furthermore, the court rejects Defendant's argument that the Indemnity and Contribution Agreement is merely "a brazen attempt to manufacture standing" because it did not exist at the commencement of litigation. Defendant contends that the Indemnity and Contribution Agreement cannot convey standing to Plaintiffs because it was signed after the commencement of the lawsuit. The court determines that Defendant's contentions are a red herring. Taken together, the Parental Support Agreement and the Indemnity and Contribution Agreement confer standing on Plaintiffs. The Indemnity and Contribution Agreement consummates and relates back to Section 4.1 of the Parental Support Agreement by putting into action General Electric Capital Corporation's promise to protect and indemnify GE Capital Financial Inc. and to pay any and all claims, damages, penalties, and expenses relating to or arising out of the CitiCapital Transaction. The Indemnity and Contribution Agreement identifies the losses to be paid by General Electric Capital Corporation.

The date of the formal memorialization of the Indemnity and Contribution Agreement is not fatal to standing because the parties clearly had a meeting of the minds regarding the Indemnification and Contribution Agreement prior to filing the lawsuit.

Moreover, even if the Indemnity and Contribution Agreement did not relate back to the Parental Support Agreement, Plaintiffs nevertheless have standing to sue because both documents predate Worthington's addition to the lawsuit as a party. Standing must exist at the time an action is filed. *Lujan*, 504 U.S. at 569-70 n.4; *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000). Accordingly, Worthington's argument is correct insofar as it goes. The rule, however, has to be applied in the context of common sense and reason. Worthington reads the rule much too narrowly. Obviously, the well-established rule that standing must exist at the time the lawsuit applies only to parties to the lawsuit *at the time it is filed*, and *Lujan* makes this unequivocally clear in the second element with the language that "the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . th[e] [r]esult [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. A necessary corollary to the rule is that it does not apply to later-added parties. Worthington was not a party to this action when it was initially filed; therefore, it is impossible for the rule to have any applicability to Worthington. If the court were to accept Worthington's interpretation of the rule, it would foreclose the ability of a plaintiff to file an amended complaint to add a party and effectively eviscerate Rule 15 of the Federal Rules of Civil Procedure in this respect. Such an interpretation produces a nonsensical result. The true scope of the rule is that standing must exist at the time a lawsuit is filed against a defendant, *or it must exist at the time a defendant is added as a party*.

Plaintiffs executed the Parental Support Agreement on July 24, 2008, and the Indemnity and Contribution Agreement on April 23, 2009. Worthington was added as a Defendant to this lawsuit on June 26, 2009, by the filing of Plaintiffs' Second Amended Complaint, which was well after the execution of both documents. Since Plaintiffs added Worthington to an existing lawsuit and asserted claims against it for the first time on June 26, 2009, the court must determine whether standing existed on June 26, 2009. Here, Worthington was added to this lawsuit *after* Plaintiffs executed the Indemnity and Contribution Agreement and the Parental Support Agreement. That the Indemnity and Contribution Agreement was not signed until March 27, 2009, which was after the date this lawsuit was filed, is quite beside the point. Accordingly, the court determines that the Indemnity and Contribution Agreement is not an attempt to manufacture standing, and the Indemnity and Contribution Agreement, in conjunction with the Parental Support Agreement, confers standing on GE Capital Financial Inc. and General Electric Capital Corporation.

### 3. Redacted Documents

Defendant's argument that Plaintiffs' documents are "riddled with redactions" and impossible to decipher is moot. Since Defendant filed its motion and reply, Plaintiffs filed an unredacted Appendix under seal. The new Appendix includes the forty critical pages that Defendant contends are "riddled with redactions." Accordingly, Defendant's contention is moot.

## IV. <u>Conclusion</u>

For the reasons herein stated, the court **denies as moot** Defendant Worthington National Bank's 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction, filed March 7, 2011; **denies** Defendant Worthington's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, filed

April 27, 2011; and **denies as moot** Plaintiffs' Motion for Leave to File Surreply to Defendant's Reply in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction.

*Now that the court has ruled on all outstanding motions, it turns to the trial of this action. If the parties are unable to resolve this action, given the age of this case, the court will try it on dates so that the trial can be completed before the end of this year. The parties are to inform the court, by **August 1, 2011**, in writing, of several alternative dates on which they can be available to try the case.*

**It is so ordered** this 25th day of July, 2011.

Sam A. Lindsay
United States District Judge